Pages 1 - 66

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

IN RE VOCERA COMMUNICATIONS,    )
INC. SECURITIES LITIGATION,     )
_____ ) NO. C 13-03567 EMC

                                San Francisco, California
                                Thursday, January 15, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          Labaton Sucharow LLP
                             140 Broadway
                             New York, NY  10005
                             (212) 907-0700
                             (212) 818-0477 (fax)
                     BY:     **CAROL C. VILLEGAS**
                             **JONATHAN GARDNER**

**For Plaintiffs:**          Robbins Geller Rudman & Dowd, LLP
                             Post Montgomery Center
                             One Montgomery Street, Suite 1800
                             San Francisco, CA  94104
                             (415) 288-4545
                     BY:     **SHAWN A. WILLIAMS**

**For Defendants:**          Fenwick & West LLP
                             555 California Street
                             San Francisco, CA  94104
                             (415) 875-2300
                             (415) 875-2391 (fax)
                     BY:     **JENNIFER CORINNE BRETAN**
                             **SUSAN SAMUELS MUCK**

**For Defendants:**          Simpson, Thacher & Bartlett
                             2550 Hanover Street
                             Palo Alto, CA 94304
                             (650) 251-5184
                             (650) 251-5002 (fax)
                     BY:     **SIMONA GUREVICH STRAUSS**

Reported By:  Lydia Zinn, CSR No. 9223, Official Reporter

1           **THE CLERK:**  Calling Case C. 13-3567, *Brado versus*

2    *Vocera*.  Counsel, please come to the podium and state your name

3    for the record.

4           **MS. MUCK:**  Good afternoon, Your Honor.  Susan Muck,

5    Fenwick & West, for Vocera and the individual defendants.  With

6    me is Jennifer Bretan.

7           **THE COURT:**  Good afternoon.

8           **MS. STRAUSS:**  Good afternoon, Your Honor.

9    Simona Strauss, from Simpson Thacher Bartlett, for the

10   underwriter defendants.

11          **MS. VILLEGAS:**  Good afternoon, Your Honor.

12   Carol Villegas, from Labaton Sucharow, for lead plaintiffs in

13   the class.

14          **MR. GARDNER:**  Good afternoon, Your Honor.

15   Jonathan Gardner, also with Labaton Sucharow, also for

16   plaintiffs.

17          **MR. WILLIAMS:**  Good afternoon, Your Honor.

18   Shawn Williams, Robbins Geller Rudman & Dowd, on behalf of the

19   plaintiffs.

20          **THE COURT:**  All right.  Thanks, everyone.

21      We're on for defendants' motion to dismiss.  And let me

22   jump to where I think the core is here.  It seems to me that

23   there are sufficient allegations on lots of points.

24      There are sufficient allegations to show that there were

25   some shortfalls, some real problems that were emerging with

1  respect to sales.  Although sales were increasing, there are

2  five quarters in a row where Vocera didn't meet its targets;

3  and it seemed to be often by double digits, especially in the

4  last four quarters.

5      There were sufficient allegations that management knew

6  things were not great, because the pressure to get sales in,

7  and then to use the tapping in the backlog.  And it appears

8  that the backlog as a source was beginning to dwindle, and

9  there were some problems with that.  And from that, one could

10 certainly infer that management had knowledge that there were

11 some issues happening.

12     But this case is hinged on -- and the theory of the case

13 is about -- the false statement and the misimpression that the

14 ACA and the sequester legislation was not having an adverse

15 impact on the company and sales.  So there was a specific kind

16 of allegation here that requires that there be a showing of

17 causation between the ACA and the BCA, and this decline [sic]

18 -- or not decline, but failure to meet expectations with

19 respect to sales, and the resort to pilfering the backlog, et

20 cetera, et cetera, and, as you know, under the PSLRA, a strong

21 inference of *scienter* that management knew that the cause was

22 the ACA and/or the BCA.  And that's where it seems the

23 allegations are thin.

24     It kind of boils down, from what I could see when I looked

25 at this thing, largely in paragraph 94, which is repeated later

1  on, wherein it's alleged that CW1 recalled that during and

2  after the IPO, concern about both laws and their impact on

3  sales was expressed at revenue meetings.  It doesn't say what

4  was said, who said it, the content of what was said, and who

5  was there, particularly with the executives.  And then the one

6  specific assertion is that CW1 specifically recalled

7  VP of Sales, Robert Flury, mentioned the ACA as one of the

8  reasons Vocera was having sales troubles.

9       I don't -- unless I'm missing something.

10      Now, there's other stuff going on.  There's this actual

11 confirmation by CW3 that, in his or her view, there were

12 adverse impacts from the ACA, and problems with hospitals

13 holding on to cash, et cetera; but I don't see an assertion

14 here that these concerns and these phenomena were being

15 conveyed to management, to upper management.

16      Similarly, CW3 recalls a 1.5 million hospital deal, in

17 paragraph 100, that fell through.  And CW3 attributes this to

18 ACA and the BCA, because of the hospital's unwillingness to

19 invest in capital expenditures; but again, it's not stated that

20 this was then reported to management.

21      So what's the evidence of *scienter* on the issue of the ACA

22 and the BCA being a positive factor with respect to, you know,

23 the impact on sales?

24      Because the statement that's alleged in the Complaint that

25 is allegedly false is that, for instance, the JPMorgan

1  analyst's report -- well, the JP analysts report the ACA did

2  not have an impact.  The Supreme Court ruling on health reform

3  and the period leading up to that did not have any marked

4  effect on demand.  Customers continue to -- you know, et

5  cetera, et cetera.

6        So, you know, that's what the theory of this case is, as I

7  understand it; that it is really a misrepresentation about the

8  impact of the ACA and the BCA, but not just the fact of failing

9  to meet sales projections.

10       And if that's the case, *scienter* has to be proven

11 vis-à-vis that representation.  So that's what I'd like to

12 hear.  Where are the allegations?  What's the evidence, at

13 least, as alleged, of management knowledge of the causal

14 relationship between disappointing sales and trends, and the

15 advent of the ACA and the BCA?

16       **MS. VILLEGAS:**  Good afternoon, Your Honor.  So I

17 think you're right.  I think that paragraph 94 is very pivotal

18 when we look to see the connection between the ACA and the

19 declining bookings, and ultimately why the company had to use

20 their backlog in order to shore up their revenue numbers.

21       And if you look at the first line in paragraph 94, it

22 says, "According to CW1, the ACA and the BCA were frequently

23 discussed during the Class Period in the senior management

24 revenue meetings."  And this makes a lot of sense, because the

25 ECA [sic] -- the ACA affected 80 percent of the company's

 1   clients, which were private hospitals.

 2       And in terms of the revenue meetings and who attended the

 3   revenue meetings, I just want to address that.  CW1 gives us

 4   very specific information as to who was at the revenue

 5   meetings.  CW1 was at the revenue meetings, and he was a Senior

 6   Manager of Order Administration.  But CW1 tells us that Zerella

 7   was at the meetings.  Defendant Zerella was there a

 8   hundred percent of the time.  He was at every single revenue

 9   meeting where the ACA was frequently discussed.

10       Defendant Lang was at --

11            THE COURT:  Which paragraph?  Show it to me.

12            MS. VILLEGAS:  I believe that's paragraph 61.

13            THE COURT:  So in the last four, the last month of

14   the quarter, there were weekly meetings.  According to CW1,

15   these meetings were held in the executive conference room, and

16   were attended by Zerella, Lang, Spitzen, O'Hagan, Hutchinson,

17   Zollars.

18            MS. VILLEGAS:  And if you continue reading, according

19   to CW1, Zollars attended the meetings roughly 50 percent of the

20   time.  Zerella and these two Vice Presidents, Mike Hutchinson

21   and Mark O'Hagan, were always there.  And Lang was at the

22   meetings about 90 percent of the time, which is almost every

23   time.  And so --

24            THE COURT:  These were -- these were what's referred

25   to as Vocera's "revenue meetings"?

1      **MS. VILLEGAS:**  Yes, Your Honor.  The revenue

2  meetings, where CW1 tells us the ACA was frequently discussed,

3  and where CW1 tells us reports were handed out which showed

4  orders, and how many orders were coming in, and which orders

5  were going to close by the end of the quarter.

6      And so just getting back to paragraph 94, if you continue

7  reading, CW1 recalled that during and after the IPO -- so the

8  entirety of the Class Period -- concern about both laws, and

9  their impact on sales, and the company's growth potential was

10  expressed at the revenue meetings that she attended with the

11  executives.  Zerella was there a hundred percent of the time.

12  Lang was almost always there.

13      **THE COURT:**  That's still sort of amorphous:  Concern

14  about both laws, and their impact on sales and potential growth

15  was expressed.

16      **MS. VILLEGAS:**  Right, Your Honor, but we also have

17  allegations from CW1, who was the Senior Manager of Orders,

18  that the ACA was affecting sales, and from the Senior Vice

19  President, Bob Flury, that the ACA was one of the things that

20  was affecting sales.

21      So if you actually look at Exhibits A and B to the

22  Complaint, which are -- which is information that was taken

23  from the internal audit report, you can see that the bookings

24  were affected, and that the revenue was affected.  And I think

25  we get an inference from CW1 telling us that the ACA was having

1    an effect, from CW3 telling us that the ACA was having an

2    effect, from Bob Flury telling us that the ACA was having an

3    effect, and the fact that the defendants expressed concern.  I

4    mean, concern implies that there was something --

5        **THE COURT:**  Is there anything in here that indicates

6    CW3 or -4 expressed those concerns to management?

7        **MS. VILLEGAS:**  No, Your Honor.  I think that CW3 and

8    CW4 support falsity more than *scienter*.

9        **THE COURT:**  So CW1 is the key to *scienter*?

10       **MS. VILLEGAS:**  Well, Your Honor -- and you have to

11   look at who CW1 was, and what CW1 did.  CW1 was in charge of

12   every single order that came through the company.  And this CW

13   provided information to Mike Hutchinson, who was also at the

14   revenue meetings, and was at the revenue meetings where all of

15   these things were discussed with the defendants.

16       And I would just say, Your Honor, that even if the Court

17   doesn't believe that there is a significant connection, or that

18   the ACA was the reason that the company's growth was suffering,

19   I would argue that we don't even need the allegations regarding

20   the ACA.  We allege that defendants were trying to mask the

21   fact that the company wasn't growing as much as they

22   anticipated.

23       **THE COURT:**  That sounds a lot different than the way

24   this Complaint is.  I looked for that.  And if you look at the

25   headings of this Complaint, as well as your case-management

1   statement, it is keyed to the causal -- the negative effects of

2   the ACA and the BCA on Vocera's business persists through the

3   Class Period, et cetera, et cetera.  I mean, that's the key of

4   the -- I mean, that's not just a general, "We're doing well,"

5   and they weren't doing well.  If that's the theory, then you

6   need to re-make this Complaint.

7        **MS. VILLEGAS:**  Well, I think, Your Honor, that it's

8   part of it.  You have the ACA allegations and the BCA

9   allegations.  And even if you only credit Bob Flury's statement

10  that the ACA one was one of the factors that impacted Vocera's

11  sales and bookings -- and I think you can look at it both ways.

12  So the ACA was one of the things affecting growth; but in any

13  event, the company was talking and touting its growth in its

14  financials when, in actuality, the company wasn't really

15  growing in the way this they told the market.

16       **THE COURT:**  Well, that's why I started off by saying

17  my understanding of this Complaint was it was keyed to

18  attribution -- a statement made about the anticipated effect of

19  the ACA and the BCA -- because that's what had long-term

20  implications, et cetera.

21       That's -- I assume that's why you focused on that, because

22  that's a major factor that was going to be persistent and was

23  going to move the market, and not just, you know, maybe a blip

24  or a little downturn here and there, or some new entry into the

25  market that has taken some market share, and you have to fight

1  back, et cetera, et cetera:

2       **MS. VILLEGAS:**  That's true, Your Honor.  And we

3  believe that CW1 gets us there.

4       But even if you look at CW2, who was a Senior Director of

5  Internal Audit, CW2 tells us that the company was missing its

6  forecasts by 20 percent every quarter in 2012, and that the

7  only way that the company could make up these numbers were to

8  use backlog.  And what CW2 says -- and this is a quote -- is

9  that Bill Zerella was focused on growth, and he used from

10  backlog -- the backlog to make the revenue numbers.

11       **THE COURT:**  Well, that's why I state at the outset I

12  think there are enough allegations here to show that management

13  knew there was a problem, and started resorting to techniques

14  to make the numbers look better than they were.

15       My problem was:  Did they make misrepresentations as to

16  the causal effect?  And the causal effect is significant

17  because of the permanence and the persistence of legislation

18  that's going to change the face of the health-care industry.

19       **MS. VILLEGAS:**  And so, Your Honor, I think actually

20  if you look at the way the false-and-misleading-statements

21  sections of the Complaint is structured, you'll see that we

22  would have a case independent of the ACA and BCA allegations,

23  should Your Honor find that they're not sufficient.  I mean, we

24  allege five separate categories of false and misleading

25  statements.  The ACA and BCA are two of those categories, but

1  the remaining three categories are the actual financials,

2  statements concerning growth, and statements concerning

3  visibility.

4      And those don't necessarily hinge on the ACA and the BCA

5  allegations.  They hinge on the fact that the company's

6  bookings were falling short of internal plan; that they were

7  failing to meet their revenue forecasts by 20 percent; that

8  they were using backlog -- 20 percent of backlog to make up

9  those shortfalls.  And that's what rendered their statements

10  false and misleading.

11      **THE COURT:**  Where do you -- I mean, this feels like

12  this is a shift, given the gist of how this case is being

13  characterized; but where -- where -- where do you see there's a

14  stand-alone misrepresentation that is totally independent of

15  any attribution to the ACA and the BCA?

16      **MS. VILLEGAS:**  So if you look at paragraph 163 -- and

17  this is statements -- the Class Period financials.

18      **THE COURT:**  Yeah.

19      **MS. VILLEGAS:**  We allege that they're false and

20  misleading because defendants failed to disclose that the

21  revenue and earnings, as reported, were only achieved by

22  pooling in revenues set for future quarters out of backlog and

23  into current quarter.  We don't mention the ACA there.

24      Now, Your Honor, I stand by the fact that we believe we

25  have enough with CW1 to allege that the statements regarding

1   the ACA were false and misleading; but separate and apart from

2   that, we have the Class Period financials.  We allege they're

3   false and misleading not necessarily because of the ACA, but

4   because of the reasons stated in paragraph 163.

5         And I would say the same for guidance in paragraph 165.

6   The reason why we allege guidance is false and misleading --

7   one the reasons is that they omitted to state that the ACA was

8   already a factor negatively impacting revenue.  That's one the

9   factors, but the other factor is why we allege that guidance is

10  false and misleading is that bookings were down, which caused

11  backlog to decline.  The company had further depleted its

12  backlog by accelerating backlog from future quarters, in order

13  to meet its revenue, thus robbing future quarters of this

14  revenue.  And so that's why we allege that these statements

15  lack a reasonable basis.

16        And just in terms of visibility statements, Your Honor, I

17  would direct you to paragraph 166B [sic].

18             **THE COURT:**  166?

19             **MS. VILLEGAS:**  I'm sorry.  176B.  And I think that

20  the statements regarding visibility are very strong false and

21  misleading statements, because when defendants talk about

22  visibility, what they're talking about is their ability to use

23  a recurring revenue from backlog to deliver consistent and

24  predictable results.  They, themselves, actually said -- and I

25  believe it was Zerella said -- that their visibility gave them,

1    quote, "tight revenue guidance."

2         And if you look at 176B, there's no mention of the ACA as

3    to why the high-visibility statements are false and misleading.

4    They're false and misleading because they gave the false

5    impression that backlog would provide consistent, predictable,

6    and growing revenue streams, when, in fact, defendant schemed

7    to smooth its financial results by accelerating revenue, and by

8    depleting backlog to make quarterly numbers cause future

9    revenue to be organically unachievable.

10        And, as Your Honor mentioned, we have alleged sufficient

11   allegations for at least these types of statements to go

12   forward based on what Your Honor already described in terms of

13   what management knew.

14        And just to put a finer point on what management knew,

15   Your Honor, we have CW1, who was at the revenue meetings,

16   telling us that at the executive revenue meetings they talked

17   about having to use backlog in order to make their quarterly

18   numbers.

19        **THE COURT:**  Okay.  What paragraph is that?

20        **MS. VILLEGAS:**  That's paragraph 103.  "CW1 further

21   advised that about 20 percent of the company's quarterly

22   revenue during the Class Period came from Vocera's pooling of

23   revenue out of backlog into an earlier quarter."

24        And earlier in paragraph 103, "CW1 recalled sitting in the

25   revenue meetings, which were attended by the individual

1   defendants" -- we cite back to paragraph 61 there -- "and

2   listening to the executive discuss how they were going to need

3   to utilize the backlog to achieve revenue targets."  And this

4   occurred from the time of the IPO throughout the Class Period.

5        And then we have in paragraph 104, corroborating CW1, "CW2

6   stated that prior to the first quarter of 2013, Vocera missed

7   its forecast in each quarter by 20 percent."

8        Consistent with CW's account, CW2 stated -- this is the

9   quote -- "We continually missed our forecast, quarter after

10  quarter; but Bill Zerella was insistent on growth, and took

11  from backlog to make up the shortfalls."

12       And I would also, in terms of backlog manipulation, point

13  Your Honor to the internal audit report, portions of which we

14  cited in the Amended Complaint.  And there CW2, who authored

15  the report, said that it was a standard practice of the company

16  to identify products that could be shipped in advance of

17  scheduled dates.  This was pervasive.

18       So we get an inference.  We know that Zerella directed

19  part of it, but I believe we also get an inference that Lang

20  and Zollars were involved, since we know that Lang was at

21  almost every single revenue meeting, and Zollers was at at

22  least half of those meetings.

23            **THE COURT:**  All right.  Let me hear the response.

24            **MS. MUCK:**  Thank you, Your Honor.  I'd like to start

25  with, I think, the financial statements, since that seems to be

1   the primary focus of plaintiff counsel's argument.

2       Although plaintiffs have paid lip service in their

3   Complaint to the ACA and the BCA, I think what this case is

4   about is an effort by them to try to take the information

5   contained in what they refer to as "the internal audit report,"

6   and spin that into an argument that the company committed

7   accounting fraud by intentionally shipping product early, in

8   violation of the company's revenue-recognition policies.

9       In fact, there is nothing in that internal audit report

10  that supports that theory.  And there is no restatement, no

11  financial adjustment, not even a tweak of the company's

12  published financials.  So plaintiffs are essentially positing a

13  theory of a -- of a securities fraud, based on the accounting

14  allegations where they are unable to identify a single instance

15  of improper accounting.

16      Now --

17          **THE COURT:**  Well, I didn't understand their theory to

18  be an accounting number that was misleading.  It was the

19  statements that were being made about what was happening with

20  the company, which was then belied by, if you look -- if you

21  use these accounting documents as probative evidence as to what

22  was going on --

23          **MS. MUCK:**  If, in fact, there were public statements

24  by the company in which they said, "We have never shipped

25  product in advance of the customer's specified ship date,"

1  perhaps they would have a basis for a claim, but that is not

2  what this case is about.  They don't make that allegation.

3      The reason that companies are not required to disclose

4  internal bookings plans is because those plans are not

5  indicative of the company's financial performance, actual

6  performance.  It's -- they're not indicative of the company's

7  public guidance.

8      Here, in fact, the only information on which plaintiffs

9  purport to rely are two documents; one-page documents.  As

10  Your Honor will recall, we were here several months ago talking

11  about the company's former internal auditor, who had

12  information that he elected to share with plaintiffs.  And

13  plaintiffs identified and -- and attached to their Complaint

14  two one-page documents.  One of them is an internal bookings

15  plan against the company's actual results, and the other is an

16  internal revenue plan against the company's actual results.

17      There is no allegation that any of those internal plans

18  were ever publicly disclosed, so the performance against those

19  plans is irrelevant.

20      Plaintiffs identify in their reply brief --

21          **THE COURT:**  Well, when you say "irrelevant," it

22  depends.  Relevant to what?  If they're making -- if statements

23  are being made to the public about strong visibility, strong

24  results, et cetera, et cetera, which leaves the impression that

25  the numbers that you're seeing there are truly indicative of

1  increasing markets, increasing sales in the sense of actual

2  accretion of accounts as opposed to, as they put it,

3  cannibalizing backlog, why isn't that a statement?

4         **MS. MUCK:**  Absolutely, Your Honor.  Every single

5  quarter Vocera met its external guidance.  This is not a

6  situation where Vocera failed to meet its guidance.  Quarter

7  after quarter, it met its external guidance.  The only miss was

8  a $578,000 miss at the beginning of fiscal 2013.

9         **THE COURT:**  Isn't there a claim that it met its

10  guidance by using backlog, in part?

11         **MS. MUCK:**  Plaintiffs attempt to argue that the

12  company made its guidance by using backlog.  And they purport

13  to read this Exhibit A to show that the company was 20 percent

14  below its internal plan in bookings, quarter after quarter.

15  I'm not sure how they read that bookings plan to show that.

16     This is Exhibit A to the Complaint.  The way I read this

17  document, it looks to me as though bookings are growing across

18  fiscal 2012.

19     But putting that aside, the individual who created

20  Exhibit A, which, by the way, is an after-the-fact document --

21  this was created after the Class Period, long after the IPO --

22  the person who created this document is CW2.  CW2 doesn't say

23  anything about the company engaging in accounting fraud, in

24  accounting misstatements or any kind of wrongful behavior.  CW2

25  identifies two instances at the end of calendar year 2012 and

1  the beginning of 2013 in which he believes the company shipped

2  product early.  Small dollar amounts.  Immaterial dollar

3  amounts.  No financial statement impact.  And no statement by

4  CW2 anywhere that the company did so improperly, with *scienter*,

5  with intent, or even to make its numbers.

6      There is one other allegation of an early --

7          **THE COURT:**  Well, it says, "By the time the company

8  reported its actual revenue, the company had made its numbers

9  by pulling in sales from the company's backlog."  This is

10  paragraph 110 in the internal audit report.  CW2 concluded

11  based on his investigation that root cause of the aggressive

12  expedited product shipments can also be linked to amortized

13  booking forecasts that led to undue reliance on go get sales

14  commits and unrealistic upside revenue realizations.

15      Doesn't that suggest that there's something misleading

16  here when you say, "Well, we met our guidance," or "We were

17  making these numbers"?

18          **MS. MUCK:**  I think what he says is what he believes;

19  that the company set -- set what he characterized as

20  unrealistic plans or targets.  I would note that nowhere do

21  plaintiffs allege facts suggesting how an internal auditor

22  would even know whether the company's sales and revenue plans

23  or external guidance were realistic.

24      But putting that aside, the paragraph does not state that

25  plaintiffs or that defendants engaged in a pervasive scheme to

1  ship product early in order to meet revenue guidance --

2  external revenue guidance.

3       The fact of the matter is that the company met its revenue

4  guidance every single quarter, up until the very end of the

5  Class Period.  And so there simply isn't a connection between

6  what plaintiffs theorize, based on two early shipments

7  identified in this internal audit report, and the report,

8  itself, especially in view of Exhibit A, which shows an

9  increase in bookings, and only at the end of the year a

10 20 percent miss between bookings, and between internal bookings

11 plan and actual bookings.

12      And then a revenue plan summary, which is Exhibit B, which

13 shows that the company met its internal revenue plan either

14 exceeded it or barely missed it for every single quarter of

15 fiscal 12.

16      **THE COURT:**  Well, let me ask.  Is there something in

17 here that indicates the volume of this backlog,

18 cannibalization, sucking the pipeline dry?  There's all this

19 qualitative description.  How do I know it's even material?

20      **MS. VILLEGAS:**  Well, Your Honor, we have a few

21 things.  We have CW1, in paragraph 103, saying that about

22 20 percent of the company's quarterly revenue during the Class

23 Period came from Vocera's pulling of revenue out of backlog

24 into an earlier quarter.

25      **THE COURT:**  Hold on.  103?

1    So it does say that 20 percent of the revenue was out of

2  the backlog.

3         MS. VILLEGAS:  Right.  I mean, paragraph 10 --

4         THE COURT:  It should not have been recognized as

5  such.

6         MS. VILLEGAS:  That's right.

7    And in paragraph 104 we have CW2 stating that prior to the

8  first quarter of 2013, Vocera missed its forecast in each

9  quarter in 2012 by 20 percent.  And that's consistent with what

10  CW1 is telling us; that they needed to use backlog to make up

11  these numbers.

12         THE COURT:  Well, I'm not sure that follows.  That

13  just shows they missed -- I don't know if that's pre- or post

14  using the backlog.  It just says "missed the forecasts by

15  20 percent."  That doesn't tell me what percentage were the

16  backlog, using the backlog technique.

17         MS. VILLEGAS:  True, Your Honor; but then I would

18  also point the Court to the first partial disclosure on

19  February 27th, when the company tells the market that there is

20  a decline in backlog from 22 million to 16 million.

21    And when you look at these --

22         THE COURT:  What paragraph is that in?

23         MS. VILLEGAS:  That's in paragraph 241.

24    And so backlog --

25         THE COURT:  So that suggests it's about at least 6 --

1  I don't know.  Who knows? -- 6 million less than it should have

2  been in --

3       **MS. VILLEGAS:**  It's 6 million less, Your Honor.  When

4  you actually compare the backlog to revenue numbers year over

5  year, the backlog at the end of 2011 was 22.5 million for

6  revenues of 79 million.  That's about 28 percent.  And that was

7  considered a healthy backlog at the time.  And if you look at

8  the backlog at the end of 2012, that's 16 million for revenues

9  of 101 million.  So that's approximately 16 million.  And then

10 the -- there's a decrease of almost 30 percent from the

11 22.5 million in 2011 to the 16 million in 2012.

12      And I think when Mike Hutchinson was talking about backlog

13 falling off a cliff, which he said to Zerella, I think this was

14 what he was talking about; that the backlog was substantially

15 decreasing.

16      **THE COURT:**  Well, what I'm trying to look at -- what

17 the actual revenue -- how much of the revenue consisted of --

18 was bulked up by this backlog.  Sounds like -- I don't know if

19 you assume the growth in the size of the backlog was about

20 $6 million was sort of borrowed in 2012 from the backlog, it

21 went from 22 to 16.  If you assume for a moment it should have

22 stayed constant or maybe even grew, one could infer that they

23 sort of borrowed about $6 million from the backlog to bulk up

24 the revenue reports -- right? -- in 2012?

25      **MS. VILLEGAS:**  Well, I think it might be more than

1   that, though, because they're probably still making some amount

2   of sales, which would add to the backlog.  So that number might

3   be hard to determine, but if you look at Exhibit B, there is a

4   column there that says the shortfall made up.

5        And this was at the very end of the quarter.  So we know

6   from CW1 that they were using 20 percent of their backlog to

7   get to the revenue number.  And we have Exhibit B, which shows

8   us that with only days to go, they were still short.

9        And the column I'm referring to is the shortfall made up

10  at the very end.

11            THE COURT:  Was that made up by the backlog?

12            MS. VILLEGAS:  Well, that's what we believe our CWs

13  support, Your Honor.

14            THE COURT:  So, for instance, in March of 2012, a

15  $1.9 million shortfall was made up, when actual revenues were

16  23 percent.  That's slightly less than 10 percent of revenues.

17            MS. VILLEGAS:  That's just with one day to go in the

18  quarter.  If you look at what CW1 tells us, CW1's telling us

19  that they're using 20 percent of backlogs.  This is just a

20  snapshot in time, with one day to go.  We allege that they

21  actually used 20 percent of their backlog to make up these

22  numbers.

23            THE COURT:  Oh, 20 percent of the backlog, or that

24  20 percent of the revenues that were reported consist of the

25  backlog numbers?

 1          MS. VILLEGAS:  This is paragraph 103.  CW1 further

 2   advised that about 20 percent of the company's quarterly

 3   revenue during the Class Period came from Vocera's pulling of

 4   revenue.

 5          THE COURT:  Yeah.  That's different from saying

 6   20 percent of the backlog.  That's saying 20 percent of the

 7   revenue was sourced out of this backlog, rather than true

 8   sales.

 9          MS. VILLEGAS:  Right.

10          MS. MUCK:  Your Honor, if I may, there's no

11   suggestion that those aren't true sales.  And that's part of

12   the problem here, is that this entire theory is premised on the

13   notion that somehow these sales were not valid sales.

14      There's no allegation of that.  There's not a single fact

15   in this Complaint suggesting that.  There are no adjustments to

16   the financials.  There's no increased returns disclosed.

17          THE COURT:  It's not that they're not valid sales.

18   It's the timing of sales.  These are sales that were booked to

19   be realized at a later point, but then pulled forward in order

20   to bulk up sales, which -- if you were buying stock and didn't

21   know that, you'd think the company's doing 20 million, but you

22   then found out that 4 million of that really wasn't normally

23   booked sales in its normal course, and a gestation period that

24   was borrowed from somewhere.  And then you're going to pay the

25   price later on, unless you make it up.  It's relevant.

1          **MS. MUCK:**  If plaintiffs allege that sufficiently,

2    then perhaps it would be relevant.  I just want to make two

3    points in that regard, though.  First, CW1 is an Order

4    Administrator.  The idea that this person is going to provide

5    this kind of information about revenue is not substantiated in

6    the Complaint.  There are no facts alleged that CW1 has a basis

7    for understanding revenue recognition.  CW1 is not identified

8    as having any expertise or role in revenue recognition.  CW1 is

9    an Order Administrator; a person who takes in orders, not who

10   has any role or visibility into what is ultimately recognized

11   as revenue.  So --

12          **THE COURT:**  But he participated in revenue meetings?

13          **MS. MUCK:**  Participated in a meeting called a

14   "revenue meeting," but there's no allegation that CW1 had

15   knowledge of revenue-recognition rules, or even what

16   transactions were recognized as revenue.

17          The second point that I think is critical here and that,

18   in my mind, disposes of this entire argument, is that at no

19   point in time has there been a disclosure that the company was

20   engaging in acceleration -- improper acceleration of shipments

21   out of backlog.  That has not ever been disclosed.

22          And plaintiffs cannot therefore show loss causation.  They

23   simply cannot demonstrate that this theory that they have

24   devised was, in fact, causally related to the stock-price

25   decline and their alleged damage.  The --

1          **THE COURT:**  But there was an allegation that there

2    were premature shipments; that one was returned, or something.

3          **MS. MUCK:**  There is no public disclosure ever of that

4    fact.  Plaintiffs allege one transaction.  CW3, one of the

5    sales reps, alleges a transaction that he contends was

6    returned.  There isn't a public disclosure of that transaction.

7          **THE COURT:**  So what was the public disclosure that

8    the plaintiffs claim caused the -- what's the ultimate public

9    disclosure?

10          **MS. MUCK:**  That caused the stock price to decline?

11          **THE COURT:**  Yeah.

12          **MS. MUCK:**  The company disclosed that they missed

13    their results from Q1 of FY13 by 587,000, and lowered guidance

14    for the rest of the year.

15          **THE COURT:**  And is there a claim that this was

16    causally related, then, to the backlog technique?

17          **MS. VILLEGAS:**  Absolutely, Your Honor.  And it's

18    interesting, because defendants main challenge to loss

19    causation is whether we've established loss causation for the

20    backlog-manipulation scheme.  We have.

21          But before we even get there, I just want to point out

22    that defendants really gloss over loss causation for the

23    remainder of the false and misleading statements that we've

24    alleged in the Complaint concerning the ACA, the BCA,

25    visibility, and growth.  In their reply and in their motion,

1   they don't say that we can't establish loss causation as to

2   these statements; rather, they argue that we haven't

3   established falsity.  But that's not a defense to loss

4   causation.

5        And if Your Honor agrees with us that any of these

6   statements are false -- even if Your Honor discounts the ACA

7   and the BCA, but agrees with us that statements concerning

8   current success, and growth, and future growth, and also

9   visibility are false and misleading -- then we satisfy the

10  pleading standards.  And I'll explain how.

11       On February 27th, which is the first partial disclosure,

12  defendants tell the market a number of things; not just that

13  they're lowering guidance for the first quarter of 2013.  They

14  say there's a significant decline in backlog.  They say that

15  the BCA was adversely impacting its business with government

16  hospitals.  They say that bookings growth for 2012 was

17  disappointing.

18       They lowered their first-quarter guidance for 2013, which

19  showed that growth was being affected.  And the stock price

20  dropped 9 percent.

21       We argue that the loss relates to the revelation of

22  defendants' omissions regarding the negative effects of the

23  BCA, but also that the company wasn't growing as previously

24  touted, reflected in the disappointing bookings, and the

25  lowered backlog, and the lowered first-quarter guidance.  But

1    this is just a partial disclosure.

2        So the final corrective disclosure actually occurs on May

3    2nd.  And on May 2nd defendants admit that uncertainties --

4    this is a quote -- "Uncertainties surrounding the effect of

5    sequestration and the Health Care Reform Act is affecting both

6    our government and now our commercial business."  They announce

7    a guidance miss for the already lowered first-quarter 2013

8    guidance.

9        And they also drastically reduced their annual guidance.

10   So they had given annual guidance of 120 to 130 million in

11   February; and they lowered that in May to 100 to 110 million.

12       And they also admit that their forecasting ability and

13   hence their visibility into future revenues has been

14   compromised.  And this is conveying to the market that

15   something is clearly wrong with the way defendants are managing

16   backlog.  And as a result of these revelations, the stock price

17   drops over 37 percent.

18       And I think it's important to look at how analysts reacted

19   to these statements, because I think it's a good way to show

20   that the market understood the connection.  At paragraph 269,

21   analysts were surprised by a lack of visibility, and the hit to

22   growth, and the guidance miss.  On May 2nd William Blair said,

23   The magnitude of the shortfall, especially after providing

24   guidance in late February, clearly surprised us.  Lastly, we

25   also thought visibility he was better for Vocera sizable

1  recurring revenue stream, predictable customary orders, until

2  this quarter; but after two straight quarters of disappointing

3  results, and the large guidance reset, we clearly overestimated

4  the predictability in the business.

5  Another analyst, on May 3rd, said, "Lack of visibility

6  highly concerning.  We're downgrading shares of Vocera to

7  market reform on a significant deceleration in the company's

8  2013 earnings growth rate, and a lack of management visibility

9  into sales.  One of our biggest concerns about this business

10  model has been the lack of clarity around recurring revenue.

11  We spoke and met with management several times through the

12  first quarter, and there was no indication there would be such

13  a drastic reduction in 2013 guidance.  We are not buyers of

14  this stock."

15  And if you keep reading, they say, "while all of these

16  factors likely played a significant role in the slow-down,

17  we're concerned by management's lack of visibility into revenue

18  and earnings."

19  And just in terms of establishing loss causation for the

20  backlog-manipulation scheme --

21  **THE COURT:**  What's the relationship between this

22  concern about lack of visibility, and the backlog issues?  Is

23  there a direct tie?

24  **MS. VILLEGAS:**  I'm sorry.  Could you please repeat

25  the question?

1      THE COURT:  What's the relationship between the

2  reference by the analysts to management's lack of visibility,

3  and the backlog techniques that had been used?  Is there a

4  direct tie between those two?

5      MS. VILLEGAS:  Yeah, there is, actually.  One analyst

6  at the beginning of the Class Period actually commented that

7  management's visibility came from a healthy backlog.  And I

8  think that that's what the analysts are commenting on.  I mean,

9  defendants made statements about visibility throughout the

10  Class Period.

11      MS. MUCK:  Your Honor, if I may, every one of those

12  sentences -- the analysts' reports that plaintiffs' counsel

13  just reviewed -- is about the reduction in guidance for 2013;

14  not -- it's not allegations or concerns about some disclosure

15  that the company had improperly shipped product and

16  cannibalized its backlog.  There isn't any -- even a whiff of

17  that in any of these disclosures.

18     These disclosures are about -- and the reason the stock

19  price fell was the reduction in go-forward guidance.  The

20  discussion of lack of visibility is because of the go-forward

21  guidance; not because of some disclosure of an accounting

22  fraud.

23      THE COURT:  Where was there a disclosure of the

24  backlog problem?

25      MS. VILLEGAS:  So the first --

1        **MS. MUCK:**  There --

2        **MS. VILLEGAS:**  The first time that the company

3  disclosed that the backlog had been reduced was in May -- I'm

4  sorry -- was in February of 2013.

5      And then when the company actually disclosed that their

6  visibility was compromised was in May.

7        **THE COURT:**  Well --

8        **MS. VILLEGAS:**  -- of 2013.

9        **THE COURT:**  Hold on.  What was the nature?  How

10  specific was the disclosure in February about the backlog; not

11  just that it went down; that it was used to bulk up revenues?

12  Is there some disclosure of that?

13        **MS. MUCK:**  Absolutely no disclosure anywhere to that

14  effect, Your Honor.

15        **MS. VILLEGAS:**  But Your Honor, we don't have to

16  provide a fact-for-fact disclosure.  And the Alaskan --

17        **THE COURT:**  Well, maybe not fact to fact, but

18  something that the analysts in the market would have inferred,

19  and thus reacted.  Otherwise, there's no causation.

20        **MS. VILLEGAS:**  So here's the causation.  In February

21  they tell the market that the backlog is down; but they also

22  tell the market that they're giving annual guidance of 120 to

23  130 million.  So the market might understand there's an issue

24  with backlog, but they don't fully understand what the

25  connection is until May.

1        In May, when the company downgrades the guidance and tells

2   the market that their visibility is compromised, the loss of

3   visibility is a reflection of the way that the backlog is being

4   used.

5            **THE COURT:**  How do we know that?  Show me where it

6   says -- what is it about the final corrective disclosure that

7   starts at paragraph 262 that -- what is a tie between this

8   reference to lack of visibility or decline in visibility, and

9   the inappropriate use of the backlog; not just its declination

10  in size, but its inappropriate use in earlier quarters to bulk

11  up the numbers, to artificially inflate the numbers?  Where

12  does it say that?

13           **MS. VILLEGAS:**  It doesn't state that directly,

14  Your Honor; but if you actually look at the statements that

15  defendants make during the Class Period about visibility,

16  they're telling the market that the visibility comes from the

17  predictable, recurring revenue, which is their backlog.

18           **MS. MUCK:**  Actually, Your Honor, every one of the

19  statements about visibility that plaintiffs cite in the

20  Complaint speaks of visibility of the recurring revenue model.

21  Our revenue model.  Our business model.

22       There is not any kind of representation that Vocera is

23  somehow able to predict, quarter to quarter, what its revenue

24  is going to be.  That is just a -- a misreading of the

25  statements in which Vocera discusses visibility.

1    Visibility relates to a revenue model or a business model

2  that depends, in part, on recurring shipments to existing

3  customers which don't even go into bookings, as well as new

4  customers, as well as service revenue.  There are ample

5  discussions in the analysts' reports quoted by plaintiffs and

6  in the company's 10-Qs about the company's visibility using

7  this revenue model or business model, but there is not any

8  representation that the company has visibility into its future

9  revenue stream.

10    One other point that I wanted to make with respect to the

11  disclosures and the absence of a corrective disclosure around

12  backlog:  Plaintiffs allege that the first disclosure occurred

13  in February, and then again in May of 2013.

14    Actually, back in November of 2012 the company explained

15  that as a result of -- I apologize --

16  (Pause in proceedings.)

17    **MS. MUCK:**  November of 2012, the company disclosed

18  that orders had slid from Q3 into Q4, and could possibly slide

19  into Q1 2013 as a result of the Budget Control Act.  Then in

20  February the company provides additional information around --

21  about the effect of the Budget Control Act.

22    **THE COURT:**  Where?  When was this?

23    **MS. MUCK:**  This is in the February disclosure.

24    **THE COURT:**  In what?

25    **MS. MUCK:**  This is in the conference-call

1 transcript -- let's see -- which is Exhibit 15.  The company

2 says, "In terms of challenges, government orders have continued

3 to slip.  As we mentioned in our last call, the November 5th

4 call, government hospital orders that we expected in Q3 got

5 pushed out.  We were able to close a couple of those deals in

6 Q4, but the majority of those orders have slipped into 2013.

7 The government has slowed its funding, due to the debt ceiling

8 and sequestration issues."

9      So that -- the notion that the company was omitting the

10 impact of the BCA on its business is simply not supported by

11 the very documents and conference-call transcripts that the

12 company cites in their Complaint.

13      The November statement, by the way, that I didn't find a

14 moment ago says we expected a big bookings quarter from the

15 federal government; yet some government contract bookings

16 slipped outside the third quarter.  And again, they talk --

17           **THE COURT:**  Is this the November 5th?

18           **MS. MUCK:**  The November 5th conference-call

19 transcript.  Yes, Your Honor.

20           **THE COURT:**  There's no reference to the ACA.  It's

21 only to the Budget Control Act?

22           **MS. MUCK:**  This is in connection with the Budget

23 Control Act.  And one of the most important elements of these

24 disclosures -- one of the most important reasons these

25 disclosures are so important is that these disclosures identify

1  the nonculpable, the nonfraudulent reason why the company had

2  an earnings miss, a very modest one, a revenue miss in 2013.

3  The nonculpable inference required by *Tellabs* is clearly based

4  on the effectiveness of what everybody agreed was a completely

5  unforeseeable situation with the federal sequester.

6       With respect to the ACA --

7            **THE COURT:**  But the argument here is not --

8  disclosure of the culpable conduct, not the disclosure of the

9  nonculpable conduct.

10           **MS. MUCK:**  Right, Your Honor, but what I'm suggesting

11 is that these facts provide a nonculpable explanation for the

12 earnings miss, as opposed to the culpable explanation that

13 plaintiffs are alluding to or attempting to assert.

14           **THE COURT:**  Well, okay.  Now I think we're getting

15 into -- I think we're getting -- when you start talking about

16 these loss analysis -- this layering, I think we're getting

17 beyond the pleading-stage issues, frankly.

18      I don't think we're beyond the pleadings stage if you

19 haven't made a threshold showing that the thing you say was

20 false was then disclosed and then resulted in a drop.  And I'm

21 not convinced, from what I'm hearing, that there's been a

22 disclosure to which any causation -- loss causation can be

23 attributed with respect to the assertion of the pilfering of

24 the backlog.  You pin it on visibility, but you haven't shown,

25 other than some earlier reference that visibility -- somebody

1   mentioned visibility's informed, in part, upon backlog.

2       But I'm looking at each of these statements here that --

3   that, in Section 5, the final corrective disclosure of May 2nd.

4   And I see nothing in here about revealing the problem of

5   bulking up earlier sales by shifting backlog, and therefore

6   inflating sales, and misleading the public, and therefore the

7   sales weren't nearly as good as they thought, and that's why,

8   you know, the stock went down.  I just don't see it.

9       **MS. VILLEGAS:**  Well, Your Honor, we do allege that

10  the loss of visibility is a reflection of the problem with the

11  backlog; but if you don't want to accept that argument, the

12  Ninth Circuit also recognizes the materialization of the risk

13  theory.  And at least for the backlog-manipulation scheme, we

14  allege that the scheme to pull in revenue from the

15  already-depleted backlog caused a risk to Vocera's current

16  business and future growth, and that the market saw the risk of

17  the scheme materialize in the form of the depleted backlog, the

18  loss of visibility into recurring revenue stream, and a

19  reduction of the future revenue in the form of downgraded

20  projections.

21      **MS. MUCK:**  Your Honor, the recent Ninth Circuit case

22  in *Apollo Group* specifically holds that Rule 9(b) applies to

23  allegations of loss causation under the federal securities

24  laws, and must be alleged with particularity.  And this theory

25  that plaintiffs are positing here simply does not satisfy the

1  loss-causation element.

2          **MS. VILLEGAS:**  Well, *Apollo* --

3          **THE COURT:**  I'm not sure I understood.  Maybe you

4  need to explain that.  I'm not sure I understand the causal

5  chain that you just went through.

6          **MS. VILLEGAS:**  So, Your Honor, the reduction of

7  backlog is a foreseeable consequence of the scheme.  And the

8  reduction in visibility is also a foreseeable consequence of a

9  scheme to deplete future revenue.

10          **THE COURT:**  Well, but it still -- I don't -- I guess

11  I don't understand.  I understand that a reduction of backlog

12  is a consequence.  Then what?  How did that affect the market?

13  How did that -- unless you tie that to this thing about the

14  loss of visibility which is, you know, attributed to the

15  reassessment of the value of the stock -- that's where I

16  earlier said I don't see that connection really clearly.

17          **MS. VILLEGAS:**  Well, I think it's tied to the

18  visibility, Your Honor, because the only way that defendants

19  were able to -- what they claim -- provide tight revenue

20  guidance, which is their visibility, is from the fact that they

21  had a predictable stream of revenue coming in from their

22  backlog.

23          **THE COURT:**  Where do you see that?

24          **MS. VILLEGAS:**  So --

25          **THE COURT:**  Why does visibility turn on backlog, as

1   opposed to recurring customers, or a pattern of reorders,

2   expected growth in new customers, or trends?  Where does it say

3   that?

4   　　　　MS. VILLEGAS:  So in paragraph 59, we allege that

5   analysts understood the importance of the company's backlog and

6   its implications on revenue, visibility, and growth.  On

7   May 7th, a William Blair analyst commented, "The visibility of

8   Vocera's revenue model is further explained by its growing

9   backlog and deferred revenue balance."

10   　　　　THE COURT:  And how do we know that that's what they

11   were referring to in -- in the final full disclosure in May,

12   when they talk about visibility; that they are talking about

13   backlog trends in substance?

14   　　　　MS. VILLEGAS:  Well, I think the analysts,

15   themselves, talk about the recurring revenue that comes in.  I

16   don't know that they use the term "backlog," per se; but at

17   least from the analyst's report that I just mentioned to you,

18   that's what analysts understood the visibility to come from.

19   It came from their backlog.

20   　　　　THE COURT:  Is there anything more than ties backlog

21   to visibility?

22   　　　　MS. VILLEGAS:  Well, besides the analyst's

23   understanding that backlog and visibility were connected, and

24   later analysts commenting on the fact that they -- the lack of

25   visibility was highly concerning.  I mean, I think that's

1  enough, Your Honor.  I think that gets us past the pleadings

2  stage here.

3        **THE COURT:**  Did any analyst in May of 2012 mention

4  the backlog definition?

5        **MS. VILLEGAS:**  There were analysts who, in February,

6  I believe, mentioned the fact that -- not backlog, but that

7  bookings growth had decelerated; but no, they didn't mention

8  the backlog.

9        **THE COURT:**  Well, isn't that kind of odd?  I mean, if

10  this was supposed to be a major deal, why?  I mean, they talk a

11  lot about lowering the revenue guidance, change in the GAAP

12  earnings per share, the expectation of revenues, what the

13  projections were, the lower utilization and reimbursement rates

14  under reform.

15        **MS. VILLEGAS:**  I mean, I just want to just point out

16  the connection again, where, when analysts are talking about

17  visibility, they're talking about backlog.  That's at least

18  what one analyst tells us.  And that's the paragraph I gave you

19  early on in the Complaint, where the analyst said the

20  visibility is explained by the growing backlog.

21        **THE COURT:**  Then why is there nothing said?  If you

22  say that the backlog situation was disclosed in its full by

23  May, it's all about the fact that -- you know, it's about

24  uncertainties regarding the effect of sequestration, and Health

25  Care Reform Act, which is why I assume that's what you

1  originally pinned this on.

2          MS. VILLEGAS:  Well, two things.  First, Your Honor,

3  we're not saying that the backlog manipulation has a

4  fact-for-fact disclosure.  I think you have to look at

5  visibility and the comments on visibility made by defendants,

6  and also the comments on visibility made by analysts.  And I

7  think that's where you get the connection.

8      But even putting that aside, if you don't find loss

9  causation for the backlog manipulation, we would at least have

10  loss causation for the statements concerning growth and

11  visibility and the ACA and BCA, if Your Honor believes that

12  we've alleged sufficient information to show that they're

13  false.

14          THE COURT:  Well, what statements regarding growth

15  and visibility that are not just forward looking are you --

16  what are you referring to?

17          MS. VILLEGAS:  So, for example, we have, on May 9th,

18  "Our business continues to perform well."  That was in an 8-K

19  signed by Zerella.

20      On May 9th at a conference call, "We've had tremendous

21  success in our core health-care market."

22          THE COURT:  What paragraph are you on?

23          MS. VILLEGAS:  So the first one was paragraph 167.

24          THE COURT:  Well, so you're saying that is a false

25  statement when they said, "We continue to report strong results

1   from our first quarter as a public company.  Our business

2   continues to perform well"?

3          **MS. VILLEGAS:**  Yes.

4          **THE COURT:**  "2012 is off to a great start"?

5          **MS. VILLEGAS:**  We have paragraph 171, where Zerella

6   says --

7          **THE COURT:**  Well, that's forward looking.  "We're

8   committed to 25 percent top-line growth over a longer time.  We

9   see significant growth opportunities."

10         **MS. VILLEGAS:**  Well, and frankly, our view has not

11  changed.  I mean, that's based on what they're currently

12  seeing.

13      But putting aside potential forward-looking statements, I

14  want to give you a couple of more examples of some statements

15  of present fact about the current growth of the company.

16         **THE COURT:**  Yeah.

17         **MS. VILLEGAS:**  So on November 5th -- this is during

18  the earnings conference call --

19         **THE COURT:**  Which paragraph?

20         **MS. VILLEGAS:**  214 to 216.  And this is after several

21  quarters of them cannibalizing future backlog to make their

22  revenue numbers.

23      Zollar says, "We've had strong results, revenue growth, a

24  very solid third quarter."

25      Zerella says, "The growth levels are pretty consistent

with historical trends.  Nothing out of the ordinary, really,
in terms of growth, as compared to previous quarters."

    **THE COURT:**  Which paragraph?  214?  Where are you
reading from?

    **MS. VILLEGAS:**  Let's see.  So in 214, so these strong
results continue to demonstrate --

    **THE COURT:**  Wait.  Give me a page number.

    **MS. VILLEGAS:**  Sorry, Your Honor.  Page 72, paragraph
214.  It's the second paragraph, in paragraph 214.

    **THE COURT:**  Okay.

    **MS. VILLEGAS:**  So "These strong results continue to
demonstrate the high visibility and operating leverage inherent
in our business model.  And I thought I'd take a few minutes
just to review several factors that led to strong results."

    **THE COURT:**  Okay.  So these "strong results" refers,
I assume, to the preceding paragraph -- although you haven't
got an ellipses, so I don't know -- where it talks about
revenues in the third quarter coming in at the top of our
guidance range.

    Do you think that's literally true?

    EBITDA and earnings per share exceed our guidance.  Gross
margins continue to expand.

    Again, I think if there's something false, I need to see
exactly where it's false.  Otherwise, it's a general statement
referring to some other facts which I haven't heard were not

1    true.

2            **MS. VILLEGAS:**  Well, I think this goes back to the

3    core of our case, Your Honor.  And I think that the *In Re:*

4    *SupportSoft* case is really on point, because in that case,

5    authored by Senior District Judge Illston, the Court said, "A

6    conscious decision to conceal the fact that the business was

7    not performing as well as expected by increasing present

8    revenue by cannibalizing its future revenue stream is

9    actionable."

10        And the similarities between the cases --

11           **THE COURT:**  Well, so are you saying that therefore,

12    the actual reports which show the amounts and meaning -- for

13    instance, guidance, itself -- were false, because they

14    concluded an artificially inflated component?

15           **MS. VILLEGAS:**  That's right.  And that's actually

16    what the *SupportSoft* Court holds.  In that case, plaintiffs'

17    argued like we do here that, to mask the fact that defendant's

18    business was generating less revenue than expected, defendants

19    decided to cannibalize its future revenue stream to meet its

20    quarterly guidance.  And in that case, plaintiffs claimed, just

21    like we do here, that it appeared that *SupportSoft* had met its

22    revenue projections.  So, just like here, where it seems like

23    they're meeting revenue projections, in *SupportSoft* --

24           **THE COURT:**  You're making a more similar argument --

25    it sounds like now -- that the statements, themselves, that has

1  actual numbers and the characterization of those numbers as

2  meeting goals were, in fact, false, because they were

3  falsely -- they were artificially inflated?

4          MS. VILLEGAS:  Yes, but there are also statements in

5  *SupportSoft*, like our statements here, about how well the

6  business was performing, and that the company was -- had

7  growth.  And the Court found that those statements were

8  actionable.

9      And what I also find to be striking about the two cases is

10  defendants in *SupportSoft* argued, just like defendants are

11  arguing here, that there's nothing wrong with accelerating

12  backlog.

13      And the *SupportSoft* Court actually rejected this argument,

14  and found that it miscast the allegations in plaintiffs

15  complaint, because defendant's tactics to increase present

16  revenue at the expense of future revenue was a conscious

17  decision to conceal the fact that SupportSoft's business was

18  not performing as well as expected.  And that's exactly what

19  Vocera was doing here.  And I would just point --

20          MS. MUCK:  Your Honor, may I address the *SupportSoft*

21  before you move on?

22          THE COURT:  No.  Let me just finish.

23          MS. VILLEGAS:  I want to point out one more thing

24  about *SupportSoft* that's really similar to our case, and it was

25  a challenge to our CW1 the defendant made earlier.  It's

1   striking how similar the CWs in *SupportSoft* and CWs here are.

2   And in *SupportSoft*, Judge Illston credited the CWs.

3       So one of the CWs in *SupportSoft* saw every sale, just like

4   our CW1, who saw every order.  And in *SupportSoft*, that same CW

5   had contact -- regular contact with defendants, just like our

6   CW1, who was in regular revenue meetings with defendants.  And

7   in *SupportSoft*, the CW said that defendants would decide which

8   deals to pull forward to meet numbers.  And that's exactly what

9   our CW1 tells us here.  And Judge Illston credited those

10  allegations, and found that that was sufficient to allege

11  securities fraud.

12          **THE COURT:**  All right.  Comments?

13          **MS. MUCK:**  May I just address *SupportSoft*,

14  Your Honor?

15          **THE COURT:**  Yeah.

16          **MS. MUCK:**  *SupportSoft* is a very different case.  In

17  *SupportSoft*, the CWs alleged that they had been directed by

18  management to go in and take existing contracts -- contracts

19  that had already been identified as revenue that were to be

20  recognized ratably over a future period, and in order to boost

21  revenues artificially, to go and change those contracts from

22  ratable licenses to perpetual licenses.

23      In other words, to convert existing, already disclosed

24  revenue from ratable contracts into perpetual ones that would

25  allow more revenue to be recognized immediately.  One of the

1  CWs was a controller who specifically talked about the revenue

2  recognition and propriety associated with that.  And the CWs in

3  *SupportSoft* stated that they had been asked to do that with

4  every single ratable contract, every single ratable license

5  that the company had in its inventory of -- of contracts.

6      Compare our case.  In our case we have, first of all,

7  allegation of two instances where CWs describe being asked to

8  ship product early.  We don't have any allegation that

9  customers rejected the product we don't have any allegation

10  that the customers didn't agree with the early shipment.  We

11  don't have any allegation --

12      **THE COURT:**  Even if they didn't, you're still taking

13  revenue that would have been reported later, and reporting it

14  earlier.  So unless they accepted it, and the revenue is still

15  there, the problem is reporting it early to complete what would

16  have been reportable.  And so timing is important.

17      **MS. MUCK:**  I would agree that timing is important if

18  the practice of backlog management fundamentally alters the

19  company's financial results; the picture that the company has

20  provided to the public.

21      **THE COURT:**  Well, 20 percent of the revenue made up.

22  At least, that's what CW1 says.  20 percent of the revenues

23  reportable in 2012 in various quarters were made up of stuff

24  that shouldn't have been accelerated.

25      And Exhibit A, which I read differently, looks to me more

1  like 10 percent rather than 20 percent; but that's still not a

2  small number.  It's still in the millions.

3       **MS. MUCK:**  Plaintiffs have not identified a case in

4  which the Courts have said, "You may not ship backlog early."

5  It -- there is no specific revenue-recognition rule that says,

6  "You may not ship backlog early."

7     This case is very much like the *Smith & Wesson* case, where

8  the Court found that there was no falsity, because the pullings

9  that occurred -- there were three in that instance -- they were

10  not shown to be unusual.  They were not shown to be a

11  significant percentage of the company's revenue.

12       **THE COURT:**  Well, here it is alleged it is usual and

13  it is a significant percentage.  It may not be -- I don't know

14  if it violates GAAP or not; but it was at least out of the

15  ordinary practice.  At least, that's what's implied by CW1 and

16  -3, and maybe -4.

17       **MS. MUCK:**  Interestingly, CW2, who's the internal

18  auditor who created Exhibits A and B, doesn't say that they

19  violate GAAP.

20       **MS. VILLEGAS:**  Your Honor, we're not alleging they

21  violated GAAP.

22       **THE COURT:**  No, I understand that.

23       **MS. VILLEGAS:**  I think that's a fundamental --

24       **THE COURT:**  I understand.  You don't need to

25  necessarily violate GAAP.  You can still make a

1  misrepresentation without violating GAAP.

2          **MS. MUCK:**  If there has been an affirmative statement

3  by the company that it was always going to make the same

4  revenues, or that revenue growth would --

5          **THE COURT:**  Well, I don't know.  I mean, you're

6  saying you can't have it implied; implicit in the

7  representation?

8          **MS. MUCK:**  Not for 10b-5 purposes.  10b-5 -- we used

9  to have the mosaic theory.  Now we have the *Tellabs*.  You must

10  look at the competing inferences.

11      Here we have two contracts, two transactions that are

12  identified as having been shipped early.  We have one very

13  ambiguous document that seems to say 10 percent, 20 percent.

14  Unclear.  It's also unclear when the 10 or 20 percent

15  difference in backlog occurred, versus public disclosures by

16  Vocera in November 2012 and February and May 2013 that sales

17  were slipping as a result of the BCA.

18      That's -- that brings me back to the point that I was

19  making earlier, Your Honor, about competing inferences, and

20  the -- this fact pattern providing a nonculpable explanation

21  for this one revenue miss about which plaintiffs complain.

22          **THE COURT:**  Do you have an explanation of Exhibit B;

23  this "shortfall made up" column?  Do you have a different

24  interpretation of what that means?

25          **MS. VILLEGAS:**  Well, ultimately, if you look at

1  the --

2          **THE COURT:**  No.  I'm asking your opponent.

3      I mean, you're telling me that this reflects the

4  cannibalization of the backlog.

5          **MS. VILLEGAS:**  That's right.

6          **THE COURT:**  I want to know if there's a competing

7  explanation for that.

8          **MS. MUCK:**  To me, this is a document that shows the

9  shortfall from an internal revenue plan, not a -- I don't

10  believe it has anything to do with backlog, per se.  This

11  company has an internal revenue plan.  There's a shortfall

12  description laid out here.  And the company is tracking it.

13          **THE COURT:**  What is "shortfall made up" mean; the

14  next-to-the-last column on the right?

15          **MS. MUCK:**  I would assume it's orders that come in as

16  the quarter progresses.

17          **THE COURT:**  So it's not necessarily tied to backlog?

18          **MS. MUCK:**  No.  There's nothing in Exhibit A or B

19  that references backlog.

20          **THE COURT:**  All right.

21          **MS. MUCK:**  And in fact --

22          **THE COURT:**  And let me ask.  You just speculating?

23          **MS. VILLEGAS:**  No.  I think the tie to backlog comes

24  from the CWs, Your Honor.

25          **THE COURT:**  No.  I mean specifically:  What is this?

1    I mean:  What explains this column, this document?

2              MS. VILLEGAS:  Well, if you look at the first -- the

3    first column, revenue update, that's March 30th.  The first

4    date under "revenue update" all the way to the left.

5              THE COURT:  Yep.

6              MS. VILLEGAS:  Days to go, which is two quarters

7    over.  So with one day to go in the quarter, somehow,

8    $1.9 million in deals came through.  I think we get an

9    inference that that was backlog.  And this isn't just a

10   reflection of how the numbers --

11             THE COURT:  Where do you get that 1.9?

12             MS. VILLEGAS:  So if you go to shortfall made up,

13   which is the second-to-last column on the right --

14             THE COURT:  Yeah.

15             MS. VILLEGAS:  And this is not just a reflection of

16   what was going on in terms of their internal plan.  We allege

17   in paragraph 163 that this shortfall was a shortfall to also

18   their publicly stated guidance.

19        So, for example -- and this is paragraph 163, in the

20   middle of the paragraph.  "On June 28th, 2012" -- so this is

21   the second entry under revenue update, all the way to the

22   left -- "with only two days to go in the second quarter, Vocera

23   was short more than 3.7 million from its internal revenue plan

24   of approximately 24.9 million.  And Vocera was short

25   approximately 3 to 4 million from its announced guidance of 24

 1  to 25 million."

 2          THE COURT:  Yeah.

 3          MS. VILLEGAS:  And we have CWs who tell us that they

 4  made up revenue shortfalls during the Class Period by using

 5  their backlog.

 6          THE COURT:  So what was reported?  What was reported

 7  actually for the third quarter?

 8          MS. VILLEGAS:  So they met their guidance for the

 9  third quarter, but I think it's misleading, because the only

10  way they met their guidance was by pulling in their backlog.

11          THE COURT:  Where does it show that they met the

12  guidance number --

13          MS. VILLEGAS:  So we have a chart earlier in the

14  Complaint that --

15          THE COURT:  24 to 25?

16          MS. VILLEGAS:  So on paragraph 78 we have a chart

17  that shows them meeting their guidance.

18          THE COURT:  70.  26 million, third quarter?  Is that

19  what I'm looking at?

20          MS. VILLEGAS:  Right.  Right.

21      And, Your Honor, I just want to make a point.  And I think

22  that the exhibit, Exhibit B, at least -- and our CW's support

23  this -- the inferences that have to be drawn have to be drawn

24  from the facts alleged in the Complaint.

25      And defendants keep talking about these two pulling deals

1   at the end of the Class Period.  Our case is not based on these

2   two deals.  We allege that this was a pervasive scheme that was

3   occurring throughout the Class Period.  The two deals that

4   happened at the end of the Class Period are just an example of

5   how desperate defendants became towards the end of the Class

6   Period to try to ship product ahead of schedule.

7            **THE COURT:**  All right.  I'm going to bring this to a

8   close.  I'm going to deny the motion to dismiss.  I find that

9   the Complaint adequately states a claim, at least under the --

10  with respect to the revenues.  I think this last illustration

11  shows that the revenues that were reported meeting guidance --

12  at least the allegations are that a substantial portion of that

13  was made up of advancing or "cannibalizing" -- quote,

14  unquote -- future revenue streams in the form of backlog which

15  they claim was not the usual practice, and was misleading.

16       And I think, for the reasons I stated at the outset,

17  management knew about these shortfalls.  I think it was

18  allegedly quite active in trying to address that by pressing

19  and utilizing the backlog situation.

20       I also find that with respect to the ACA and BCA portion

21  of the allegations, which I thought were the focus of this

22  Complaint -- at least, it read that way -- I think, perhaps

23  barely, the allegations regarding CW1 and his presence at all

24  of these revenue meetings at which all of the principals were

25  present, in which it was discussed about the impact of the

1  potential legislation, and expressed concerns about the impact

2  on the revenues was also inconsistent with at least the alleged

3  statements that were made to the public expressing confidence

4  that the ACA and BCA were not going to adversely impact, at

5  least, as alleged at this point.

6      There are some -- I suspect as we get further, it's going

7  to be more complicated, because there was some disclosure of

8  the impact of the BCA, and how it caused some orders to slip,

9  and there may have been some disclosures as early as November

10  of 2012 that may complicate the causation chain; but at least

11  for purposes of the 12(b)(6), I find that an adequate

12  statement's been made.

13         **MS. STRAUSS:**  Your Honor --

14         **MS. MUCK:**  Your Honor, there are Section 11 claims,

15  as well.

16         **THE COURT:**  Those pertain to the IPO?

17         **MS. MUCK:**  That pertain to the IPO.

18         **MS. STRAUSS:**  I'd like to be heard on those,

19  Your Honor.

20         **THE COURT:**  All right.  Well, on the IPO, I think

21  those are more problematic, because that's earlier on in the

22  process, and much of this hadn't occurred.  And frankly, I was

23  going to say that I don't find that, at least as of that point

24  in time, there has been an adequate showing, because again, at

25  that point, it was only sort of early talk, at most, of the

1  possible impact.

2     Much of what we just discussed, I think, occurred after

3  the IPO, in terms of the actual, real-world impact of -- in

4  terms of the revenue streams, and missing the goals, and the

5  acceleration-of-the-backlog technique.  Unless I have the

6  timing wrong, that's my understanding of the sequence of

7  things.

8        **MR. GARDNER:**  Can I be heard on that, Your Honor,

9  briefly, given the time?

10    And the Section 11 and 12(a)(2) that we claims that we

11  allege only relate to the ACA, so they have nothing to do with

12  the backlog.

13        **THE COURT:**  Okay.

14        **MR. GARDNER:**  It does have to do with -- it is a

15  pinpoint in time with respect to the IPO, which is at the very

16  beginning of the Class Period.  So the focus -- the sole

17  focus -- is on the ACA.

18    And what we have to support the statements in the IPO

19  being false, again, are CW1, the Senior Manager Order

20  Administrator, who has told us that at the time of the IPO the

21  Vocera executives were already concerned about the impact of

22  the ACA on sales and growth.

23        **THE COURT:**  But they hadn't seen any real impact.

24  And revenues had been increasing.  And the ACA had passed in

25  2010.  And there had been substantial growth in revenues from

1  2010 to 2012.

2         MR. GARDNER:  But what we do know is at the time of

3  the IPO, pursuant to Exhibits A and B, which we've spent a lot

4  of time talking about so far today, the fact is that the

5  company was already seeing a slow-down in growth and orders, as

6  reflected in those documents which show that they were behind

7  plan in revenue, and they were behind plan in bookings.

8      And those were facts that existed at the time of the IPO;

9  that that document -- the end of the first quarter of 2012

10  comes three days after the IPO.  So the fact that they were

11  already being impacted --

12         THE COURT:  Well, but not being impacted by the first

13  quarter of 2013 -- yeah, you've got now five quarters in a row

14  and an increasing trend, from 8.4 percent of missing the mark,

15  to 12, to 20 percent, to 20.5 percent.

16      As of the beginning of 2012, all you had is -- you know, I

17  don't know what happened in the fourth quarter of 2011.  That's

18  not discussed here -- or throughout 2011, 2010.  I think the

19  revenues were increasing.  It's a single digit off the mark at

20  that point.

21         MR. GARDNER:  It's two basic pieces of information

22  that we combined to draw the inference, Your Honor.  The first

23  one is:  The fact is that that document shows that they were

24  short of plan, and in a significant amount.

25      Two, CW1 tells us that at the time of the IPO, they were

1    already concerned, and talking about the negative impacts of

2    health-care reform; the ACA in particular.

3        And CW2 tells us that even at the time of the IPO, they

4    were already going into backlog in order to -- in order to make

5    up that shortfall.  So --

6            **THE COURT:**  Which paragraph is that?

7            **MR. GARDNER:**  That's paragraph 361, which is in

8    Part 2 of our Complaint, which is where we allege the

9    Securities Act claims, Your Honor.

10           **THE COURT:**  It doesn't say how long that had been

11   going on.  It just says --

12           **MR. GARDNER:**  It's a general statement.  And let me

13   take a step back for a second, and -- and give you a little bit

14   of perspective of where we're coming from with respect to the

15   Securities Act claims.

16       I think we need to start with the proposition that the

17   Securities Act claims, as opposed to the Exchange Act claims,

18   are governed by a lower standard.  We're subject to Rule 8 in

19   our pleading standard for the -- for the Securities Act claims.

20       And I say that because those acts -- those claims do not

21   sound in fraud.  In order to sound in fraud under the case law,

22   under -- under *Stack Electronics*, under *Nollenberger*; both

23   Ninth Circuit decisions.  In order to sound in fraud, you have

24   to allege -- the Complaint must allege a unified course of

25   fraudulent conduct, and rely entirely on that conduct as the

1    basis for the claim.

2         Here, we clearly separated the two claims.  We have a

3    complete separate part of the Complaint alleging the Securities

4    Act claims.  We take great pains to just assert

5    negligence-based claims.  If you look at paragraphs 301, 337,

6    389, 390, et cetera, we're only talking about negligence claims

7    with respect to the Securities Act part of the Complaint.  And

8    we -- and so we have a separate series of allegations; a

9    separate standard.

10        And if you look at the *Nollenberger* case from 2005, it's

11   clear that if you -- if you do those, you take those steps, you

12   do more than just simply nominal efforts, which is the cases

13   that the defendants cite.  You're entitled to plead in that

14   manner, and you're entitled to Rule 8.

15        So under Rule 8, we believe that those two pieces of

16   information -- CW testimony about how they were already

17   concerned at the time of the IPO that the ACA was having a

18   negative impact, combined with the exhibits we attached to the

19   Complaint that show there was a shortfall at that time -- that

20   is sufficient, we believe, under Rule 8, to state a claim under

21   both Section 11 and Section 12(a)(2); that this was a fact that

22   existed at the time.

23        And I should note, Your Honor, under the third prong of

24   Section 11, which holds defendants accountable for an omission

25   that renders what they do say misleading, there's no knowledge

1  element.  We don't have to show that the defendants knew that

2  this was having -- that the ACA was having a negative effect.

3          **THE COURT:**  Still shows negligence, at the very

4  least.

5          **MR. GARDNER:**  It's just a negligence standard.  Yes.

6          **THE COURT:**  Given how early it is, and given that the

7  ACA had been in effect for some time, what's the record of

8  indication that the problem was as severe as it turned out to

9  be, or at least as alleged it turned out to be as of March

10  2012?

11          **MR. GARDNER:**  Well, the two pieces of information are

12  what we have and what we've alleged.  And that's what we have

13  at this point, which is that the CW testimony that they were

14  already concerned and talking about it at revenue meetings at

15  the time of the IPO; and the Exhibits A and B, which show a

16  shortfall to plan both in terms of bookings and revenues.

17      Those two pieces of information combined, we submit, gives

18  us an inference that that fact existed at the time of the --

19  that fact existed at the time of the IPO.  And under Rule 8,

20  that's all we need.  We need a fact that existed at the time of

21  the IPO that rendered their statements misleading.

22      And --

23          **THE COURT:**  The IPO was on what date?

24          **MR. GARDNER:**  It was March 28th of 2012.

25          **THE COURT:**  What indication is there that the

1  shortfall, which was apparent from revenue plan in March of

2  2012, was attributable to the ACA?

3      **MR. GARDNER:**  It's just the CW testimony that said --

4  that I've already alluded to, which says that the company

5  was -- was concerned about the ACA at the time.  And --

6      **THE COURT:**  But there's no substantive evidence.

7  There's no testimony that, you know, as examples of later on,

8  where CW2 or -3 -- I forget -- talked about some examples of,

9  you know, cancellations, and belt tightening.

10     There's no narrative here.  There's no description to show

11 a causal connection between the ACA and that first-quarter

12 failure to meet expectations.

13     **MR. GARDNER:**  No.  It's that CW; a very important CW,

14 too.  I would send you to paragraph 359 of the Complaint, where

15 we make that allegation that the Senior Manager of Order

16 Administration stated that the ACA was one of the factors

17 affecting Vocera's sales and bookings at that time, at the time

18 of the IPO.  That's the -- that's what we're relying upon.

19     And I go back to our Rule 8 standard, which is a notice

20 standard.  The Securities Act claims are not subject to the

21 PSLRA.  They're not subject to 9(b).

22     **THE COURT:**  He also says that a former Health Systems

23 Director confirmed that by mid 2012, Q2 and Q3, at the time of

24 the second offering, he observed actual negative effects.

25     Sort of the negative predicate of that is:  Before that,

 1  there were no actual negative effects.

 2          **MR. GARDNER:**  Well, I don't know if that's a fair

 3  inference.  I think that we're asserting there what CW3, the

 4  former Health System Director, told us in support of a claim

 5  that's no longer in the Complaint.

 6      In other words, that's an assertion that was made in order

 7  to support the claim with respect to the secondary offering.

 8  We have acknowledged in our briefing that that's subject to

 9  dismissal, because of a lack of a named plaintiff for standing

10  purposes; but I don't know that it's fair to draw the inference

11  backwards from that.  I think you have to take it for what it's

12  worth, which is:  He observed it by mid 2012.  That doesn't

13  mean it wasn't already being observed by March of 2012.

14          **THE COURT:**  All right.  What's your response?

15          **MS. STRAUSS:**  On behalf of the underwriter

16  defendants, named defendants only in connection with the

17  Securities Act claims.

18          **THE COURT:**  Yeah.

19          **MS. STRAUSS:**  And until about ten minutes ago -- I

20  know the courthouse is closing soon, but I was still waiting

21  for my case to be heard.  Everything that was discussed -- we

22  talked about February 2013, May 2013, November 2012.  All of

23  these communications, guidance, disclosures, statements, calls,

24  meetings took place well after the IPO, and well after my

25  clients had anything to do with this matter.

1          THE COURT:  Okay.

2          MS. STRAUSS:  The only relevant point is the time at

3   which the registration statement went effective.  So that's

4   March 28th, 2012.

5          THE COURT:  Okay.

6          MS. STRAUSS:  You know plaintiffs conceded there's no

7   standing as to the secondary offering, and they didn't oppose

8   our motion to strike.  All allegations related to the secondary

9   offering.

10      What they're very heavily relying on is an exhibit to the

11   Complaint that, on its face, was not available at the time of

12   the IPO.  This was something that was created over a year

13   later.  They cannot rely on that document to say that this was

14   the state of knowledge at the time of the IPO.  And frankly,

15   there's just nothing in the Complaint other than a CW who says

16   that there was discussion about vague concerns about potential

17   effects.  That is not the same as saying that there were

18   effects at the time the registration statement went effective.

19          MR. GARDNER:  Very briefly, Your Honor, two rebuttal

20   points.  One, counsel mentioned that the underwriter defendants

21   are not named in the Exchange Act claims.  That's true.

22      A further reason why Rule 8 standard applies to the

23   underwriter defendants:  Because there's no allegation in the

24   Complaint anywhere that they did anything other than act in

25   negligence.

1        Second, with respect to Exhibits A and B, counsel is

2   right; that document was created post IPO.  But she's linking

3   it to a knowledge element, and there is no knowledge element in

4   Section 11 or 12(a)(2).  It's a negligence standard.  That --

5   we don't have to show they knew that the ACA was having a

6   negative effect.  We have to show the existence of the fact.

7   And that document --

8            **THE COURT:**  Yeah, but I mean negligence -- you have

9   to have some knowledge that you're off base.  You may not

10  have --

11           **MR. GARDNER:**  No.  It's a negligence standard.  It

12  could be because they didn't perform sufficient due diligence

13  at the time.  There's no knowledge element.

14           **THE COURT:**  What's the indication of that?

15           **MR. GARDNER:**  The indication is that they didn't

16  perform -- at this stage, under Rule 8, the fact that the fact

17  existed is sufficient to state a claim, and let us get into

18  discovery.

19           **MS. MUCK:**  Your Honor, I would just point out as to

20  the individual director defendants who are named only in the

21  '33 Act claims, we join the arguments made by the underwriters.

22       In addition, we haven't discussed bespeaks caution, but

23  obviously the prospectus was replete with warnings about the

24  potential impact of health care reform and government

25  regulation generally.

1     So I think that plaintiffs have not satisfied their burden

2  of identifying a false -- much less a materially false --

3  statement in the prospectus.

4     The CW1 allegation is very vague.  Simply to say that the

5  ACA was of concern -- it begs the question.  Obviously, it was

6  of concern.  It was disclosed in the prospectus under risk

7  factors.  That doesn't mean that there was a material

8  misstatement about the company's anticipated performance in

9  light of the ACA.

10          **THE COURT:**  All right.

11          **MR. GARDNER:**  Just to be clear, Your Honor, we're not

12  alleging a misrepresentation per se.  Our claims are centered

13  on omissions, not on --

14          **THE COURT:**  Well, what about the fact that there were

15  some, at least, general warnings in the materials --

16  registration materials?

17          **MR. GARDNER:**  Well, it doesn't -- there's no -- there

18  was no warning that the ACA was, in fact, having a negative

19  impact upon sales.

20          **THE COURT:**  Well, in fact, that's what's not so

21  clear.

22          **MR. GARDNER:**  Our allegation is it was happening, in

23  fact.  And it's based upon the two things that I've already

24  alluded to.

25          **THE COURT:**  All right.  Well, you know, you rely

heavily on the CW1.  And I think the CW1 statements are too general.  If you want to amend and come back and say something much more specific; that, in fact, there was a discussion of the impact already happening, and it was evident, such that it was negligent not to say anything more or disclose anything more.

    But to say that, you know, there were discussions of concern, et cetera, et cetera, I think doesn't prove much; not enough at this juncture.

            **MR. GARDNER:**  Understood, Your Honor.

            **THE COURT:**  So all right.

            **MS. STRAUSS:**  Your Honor, just one very brief final point.  The lack of falsity is applicable to all of the Securities Act claims; so whether Section 11 or Section 12(a)(2); but we also have a claim for five of the six underwriters.  As to 12(a)(2), there's no statutory standing by the one named plaintiff as to those five.

            **THE COURT:**  I understand.

    So I'll get out a brief order summarizing where we're at. I think I've indicated that.

    Let me just ask in terms of where we go from here in our case management -- and it is late.  We need to wrap this up. But the plan, as I understand it, was to start down the road of discovery and class certification within six months or so of this Court's Order, should this case proceed.  And at this

 1   point, it is proceeding, at least in part.

 2        So I want to find out -- and also there was talk about ADR

 3   after this Court's ruling on the motion to dismiss.   I want to

 4   raise those two things with you:   Should we set a

 5   class-certification schedule and discovery schedule now, as

 6   well as what's going to happen with respect to ADR?

 7              **MR. GARDNER:**   Well, with respect to ADR, I think it

 8   would be plaintiffs' position that, to the extent that the

 9   parties are going to engage in ADR, that we do do that through

10   a private mediation at some point when it's appropriate.

11        We haven't -- obviously, this changes the landscape.   We

12   haven't digested your Order yet.   So I think that we -- I would

13   be fine leaving it that the parties have generally talked about

14   ADR, and at an appropriate time, if both parties agree, we

15   would go to private mediation.

16              **THE COURT:**   Do you anticipate mediation prior to

17   class cert.?

18              **MR. GARDNER:**   I haven't given it a lot of

19   consideration.   As plaintiffs, we're amenable to discussing

20   settlement prior to class certification.   So it would be -- I

21   think defendants -- they would have to talk to their clients

22   and see where their comfort is on that issue.

23              **MS. MUCK:**   Correct.   I would need to discuss with my

24   client the assurance that we could get that any kind of

25   resolution would be binding based on an appropriate class

1  representative.

2       I don't foresee being able to reach -- I'm sure we won't

3  be able to reach an agreement with plaintiffs on whether to do

4  class certification before ADR or after.

5       I think the bigger question will be some sort of exchange

6  of initial discovery or disclosure beyond what's already

7  been --

8            **THE COURT:**  Okay.

9            **MS. MUCK:**  -- provided.

10            **THE COURT:**  All right.

11            **MS. MUCK:**  It's just very difficult at this point, I

12  think, for plaintiffs or defendants to evaluate the case,

13  given --

14            **THE COURT:**  Yeah.

15            **MR. GARDNER:**  I mean, I know we're here.  And I'm

16  happy to kind of go through what I think an appropriate

17  schedule would be.

18       Another way to do it is to allow us to take a week or so

19  to come up a with mutually agreeable schedule.

20            **THE COURT:**  Why don't you do that?  And I'll think

21  about the ADR, and where that might fit in the process.  And

22  then if you could submit a joint schedule.  If you can't agree

23  on a joint schedule, submit your relative proposals, and I'll

24  pick and choose about that.

25            **MR. GARDNER:**  And we can come back to talk about, or

1   we can do it by phone.

2        **THE COURT:**  Well, we should schedule a further status

3   conference in any event.  Maybe we should schedule something

4   fairly short, like 90 days out, so it doesn't get too far

5   along.

6        **MS. MUCK:**  That makes sense.

7        **THE CLERK:**  April 23rd at 10:30.

8        **MR. GARDNER:**  April 23rd.

9        **THE CLERK:**  10:30.

10       **THE COURT:**  But I would assume we're going to set

11  class cert. and discovery schedule before then, along the time

12  lines that we discussed; something that would commence within

13  about six months.

14       **MR. GARDNER:**  I'm sorry, Your Honor.  The --

15       **THE COURT:**  That the class-cert. motion be filed

16  within about six months or so, whatever schedule you work out.

17       **MR. GARDNER:**  Yeah.  I think that that's fine.  I

18  think that that's an appropriate time for us to do what we need

19  to do to get our class-certification motion on file.

20       **THE COURT:**  All right.  Then I'll see you at the CMC.

21       **MS. MUCK:**  Okay.  Thank you, Your Honor.

22       **MR. GARDNER:**  Thank you.

23       **THE COURT:**  Thank you.

24  (At 5:20 p.m. the proceedings were adjourned.)

25

1   I certify that the foregoing is a correct transcript from the

2   record of proceedings in the above-entitled matter.

3

4

5   _____   January 26, 2015
    Signature of Court Reporter/Transcriber   Date
6   Lydia Zinn

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25